IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 (Involuntary) |
| THOMAS BRINCKS, | ) | |
| | ) | Bankruptcy No. 11-00371 |
| | ) | |
| Debtor. | ) | |

## ORDER RE: MOTION TO DISMISS INVOLUNTARY
## BANKRUPTCY CASE

This matter came before the Court for trial on June 21, 2011.   Jeffrey Goetz

and Tony James represented Petitioning Creditor, Agri-Associates, Inc.   Michael P.

Mallaney represented Alleged Debtor, Thomas Brincks.   After presentation of

evidence and argument, the Court requested post-trial briefing and took the matter

under advisement.   This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and

(O).

## STATEMENT OF THE CASE

Agri-Associates, Inc. filed an Involuntary Petition as a single qualifying

creditor on behalf of Alleged Debtor Thomas Brincks.   Brincks moved to dismiss

the involuntary case.   Brincks argued that his debt with Agri-Associates was the

subject of a bona fide dispute, rendering Agri-Associates ineligible to file the

Petition.   Brincks also argued that Agri-Associates filed the Petition in bad faith

because it knew Brincks had twelve or more qualifying creditors on the Petition

date.   As such, Brincks argued that other creditors who later joined the Involuntary

Petition could not "cure" the deficient filing.   The Court overrules the Motion to

Dismiss and enters an Order for Relief in this case.

## PROCEDURAL BACKGROUND

Agri-Associates, as a single petitioning creditor, filed a Chapter 7 Involuntary

Petition against Brincks on March 1, 2011.   Agri-Associates then filed an

Emergency Motion for the Appointment of an Interim Trustee.   The Court

conducted a hearing on the Emergency Motion on March 10, 2011.   After hearing

testimony and arguments, the Court entered an Order directing the U.S. Trustee to

appoint an interim trustee in this case.   The parties then entered into a stipulation

and consent agreement that attempted to distinguish between pre-petition and

post-petition income and outline an order that provided a specific living allowance

for Brincks.   Charles L. Smith was appointed Interim Trustee.   The Court then set

the matter for trial on the involuntary filing.

On March 29, 2011, Bill Wollesen joined the Involuntary Petition as a

petitioning creditor.   On April 5, 2011, New Cooperative joined the Involuntary

Petition as a petitioning creditor.   On July 9, 2011, Thomas Trecker and Trecker

Brothers separately joined the Involuntary Petition.   Brincks has filed separate

objections to each joinder on the basis that such creditors could not be added to a "bad faith" filing.

On March 29, 2011, Agri-Associates moved to continue the trial.   The Court heard the Motion to Continue on April 4, 2011.   The Court entered an Order continuing the discovery deadlines and the trial and directing Agri-Associates to post a protective "cost bond" under § 303(e) in the amount of $20,000.

A few weeks later, Brincks moved to dismiss the involuntary petition based on Agri-Associates' failure to comply with the Court Order to post a bond. Immediately after Brincks' Motion was filed, Agri-Associates obtained a letter of credit from Iowa State Bank and filed with the Court proof of its surety bond.   The Court then denied Brincks' Motion to Dismiss.

Brincks filed an Answer and Counterclaim, alleging Agri-Associates filed the Petition in bad faith, and that Agri-Associates knew Brincks had more than twelve (12) creditors at the time it filed the Involuntary Petition.   Brincks claimed the Involuntary Petition required three petitioning entities at the time of filing under § 303(b)(1).

Trial was set for June 14, 2011.   Agri-Associates filed three pretrial motions. Agri-Associates moved to quash Brincks' subpoena for certain testimony from Ms. Schroeder, requested judicial notice of certain matters, and filed a Motion in Limine.

3

Agri-Associates also filed an Objection to Brincks' Witness and Exhibit Lists.   At the parties' request, the Court conducted an expedited telephone hearing on the pretrial Motions and Objection on June 13, 2011.

The pretrial telephone hearing focused on arguments about the finality of Agri-Associates' state court judgment against Brincks and attempts to relitigate issues.   Agri-Associates argued that the <u>Rooker-Feldman</u> doctrine and res judicata prevented Brincks from introducing evidence attacking the basis for the state-court judgment.   Agri-Associates requested that the Court take judicial notice of the state court's judgment against Brincks.   Brincks argued the judgment merely represented Agri-Associates' prima facie case that there was no bona fide dispute on the amount of his liability to Agri-Associates.   Brincks further argued that he should be afforded the opportunity to present evidence to rebut Agri-Associates' prima facie case.   The Court reserved its ruling for the next morning at the beginning of the scheduled trial.

At the time of trial, the Court took up the preclusion arguments and the other Motions and Objections.   Brincks noted the issue surrounding Ms. Schroeder's testimony had the potential to be resolved through other witnesses that were present on the first day of trial.   Ms. Schroeder's subpoena was for the second scheduled day of trial.   On that basis, the Court delayed its ruling on the Motion to Quash and

4

Objection to Ms. Schroeder's testimony.    The Court then heard further argument

from counsel on the issues relating to the state-court judgment.    The Court noted it

was unlikely it would question the finality of the state-court judgment, but overruled

Agri-Associates' Motion in Limine and Motion for Request for Judicial Notice until

those issues were fully presented in the evidentiary record.

## FINDINGS OF FACT

Thomas Brincks, the Alleged Debtor, and Tim Reever, the owner of

Agri-Associates, the principle Petitioning Creditor, have known each other since

high school.    They were in 4-H together.    They both attended Iowa State

University and were fraternity brothers.

After completing study at Iowa State in 1987, Tim Reever worked in the

farming industry.    He farmed and transacted in chemical, seed, and fertilizer sales.

He also performed consulting work.    Reever owns and operates Agri-Associates,

which—as noted above—is the petitioning creditor in this case.

Tom Brincks began working for Van Diest Company after completing study

at Iowa State.    Van Diest is a major player in the agricultural supply industry.    Tom

Brincks worked as a salesman for Van Diest.

The Van Diest Company is a large family-owned business.    All parties agree

that the Van Diest family is very wealthy.    Estimates were made during the hearing

5

of the family fortune approaching one billion dollars.    However, no party offered
specific evidence to support those estimations.

Tom Brincks eventually married Beth Van Diest, daughter of the company's
founder.    There is undisputed testimony that she owns a one-fourth share of the
company.    It is also undisputed she is an heir to, if not already an owner of, a
significant family fortune.

In the mid-1990s, Reever (through Agri-Associates) began buying a portion
of his agricultural chemicals from Brincks, who represented Van Deist Company.
Reever did this as a result of his friendship with Brincks and based on the desire to
help Brincks' career.    The business relationship between the two continued for
many years.    However, it later changed significantly.    Instead of buying from
Brincks, Reever primarily sold chemicals to Brincks.    Reever would purchase
chemicals from Van Deist and re-sell them to Brincks.    Brincks began buying
chemicals to resell independently even though he was still working as a salesman for
Van Deist.    Reever did not discover, until much later, that Brincks—by buying
from Reever and turning around and selling the chemicals—was violating his
contract with Van Deist.    The relationship and sums transacted grew significantly
over the years.

6

The transactions between Reever and Brincks involved here must be understood in the context of the agricultural supply industry.   Both parties described a system where significant rebates are part of the agricultural chemical sales transaction.   Manufacturers offered large rebates, in the neighborhood of 20-40 %, that the manufacturer pays once the sale is completed.    The sale is completed if and when the buyer pays for the chemicals.   This is a significant middle-man business—the middle-man buys from the manufacturer and then resells the chemicals to third-parties.   When the sale is complete, the middle-man receives significant bonuses or rebates.

The rebate practice is very well known.   It is built into the price of many agricultural supply transactions with those buying from the middle-man in the process.   Rebates, or a large percentage of them, are passed along to the end-buyers when the buyers pay for the chemicals.

While the rebates are settled upon payment, extension of credit in very large sums is a common practice.   Often the manufacturer sells to the middle-man on credit.   The middle-man then sells to the buyer/end-user on credit.   Later, the parties settle the accounts (including any rebates) as payments come in.   The accounts are netted out in June, which is often referred to as "net June."

7

Reever—through his company Agri-Associates—sold to Brincks under this credit-rebate and netting system.   They transacted very large sums of money, which eventually reached the multi-millions of dollars.   Reever and Brincks seemed to work very well for many years.   Accounts were all paid off or "netted" through 2006.

Reever was comfortable with making very large extensions of credit, in part, because he believed the credit risk was good given that Brincks had married Beth Van Deist.   Beth Van Deist even eventually appeared as a party on the account transactions with Brincks.   At the end of 2006, however, things began to fall apart.

While the 2006 accounts "zeroed" or "netted" out, 2007 and 2008 led to huge debts.   These debts spawned this case.   Brincks failed to pay Reever (Agri-Associates) for a sizable part of the 2007 and 2008 transactions.   As the balances reached the multi-millions of dollars, Reever (Agri-Associates) got very anxious.   Brincks continually reassured Reever that he would "make it right." Reever eventually became aware that Brincks was being sued by others.

Eventually, the inability to collect from Brincks caught up to Reever (Agri-Associates).   Agri-Associates, Reever, and Reever's wife were eventually sued in the Iowa District Court for Carroll County by Van Deist—Brincks' employer and one of Reever's (Agri-Associates) suppliers.   They thought about

8

their options, but eventually concluded they had to add Brincks to the Van Diest lawsuit.   They added Brincks as a third-party.

The Third-Party Petition (Exhibit 14) stated that a substantial amount of the product Agri-Associates purchased from Van Diest was sold by Reever to Brincks. Reever (Agri-Associates) claimed Brincks had failed to pay for much of what Brincks had purchased.   Reever alleged Brincks owed him and Agri-Associates approximately $15,605,501.39 for purchases in 2007 and 2008.   Reever attached to the Third-Party Petition numerous invoices from Agri-Associates, to "Tom and Beth Brincks".   Reever (Agri-Associates) additionally requested incidental damages, interest on the debt, and costs of the action.

Brincks eventually answered the Third-Party Petition.   He did not bring a counter-claim even though he now claims Reever (Agri-Associates) actually owed him significant money at that time.   Brincks employed Michael Mallaney, a distinguished Des Moines debtor/creditor and bankruptcy attorney, who is also representing Brincks in this proceeding.   Agri-Associates and Reever eventually filed a Motion for Summary Judgment as to the claims against Brincks.   Brincks, through Mr. Mallaney, asked for additional time to respond in order to conduct additional discovery.   The Court granted him the additional time.   Brincks failed to respond to the Motion for Summary Judgment by the extended deadline.

9

The Iowa District Court entered an order on the Motion for Summary Judgment on May 12, 2009.   It noted the matter came on for non-oral submission the previous day and Brincks had not resisted.   The Court granted the Motion for Summary Judgment.   It entered judgment for "$16,131,368.34 together with interest accruing thereon at the rate of $7,955.23 per diem from February 1, 2009." Brincks claims now that he could not afford to have his attorney respond to the Summary Judgment Motion.   However, Mr. Mallaney had not withdrawn as attorney.

After judgment was entered, Brincks filed a pro se "Motion to Quash" the Summary Judgment Order.   Brincks sought a limitation or reduction of the judgment and contested the interest amount and interest calculation.   It does not appear that Brincks contested the principal amount.   At trial in this matter, Brincks admitted he owed at least a significant amount of the principal—if not all of it.

The Iowa District Court eventually held a hearing on Brincks' pro se Motion to Quash.   The judge told Brincks that he could not attack the Summary Judgment Order through a Motion to Quash.   The judge advised Brincks of what he needed to file.    Brincks never filed anything more in the Iowa District Court case.   He never appealed.

10

Reever (Agri-Associates) then attempted for an extended period of time to collect on the judgment.   Reever pursued Brincks for information about assets and his ability to pay.   Reever employed counsel and held three different judgment-debtor exams of Brincks.

The first judgment-debtor exam was in August 2009, three months after the Summary Judgment order.   Reever's counsel issued a subpoena deuces tecum specifying the documents Agri-Associates requested Brincks to bring to the judgment debtor-exam.   Many exhibits offered at trial were Brincks' responses to the document requests from the judgment debtor exams.   Brincks submitted his written responses to those document requests on colored paper with very small print. They were extremely hard to read.   Brincks sarcastically offered a magnifying glass he brought with him when asked about the documents.   The responses for the first judgment-debtor exam were admitted into evidence as Exhibit A.

Reever's counsel noted Brincks was evasive and difficult throughout all of the judgment-debtor exams.   The transcript of the first exam (Exhibit 2)—and a later exam in 2011 (Exhibit 3)—bear that out.   Brincks provided partial information and little help in obtaining concrete or accurate information.   Reever was present for Brincks judgment-debtor exams.   Reever says Brincks' testimony and attitude was

shocking because it became clear that Brincks would never pay him.   Reever and

his attorney both testified that they felt Brincks made a mockery of the process.

At the 2009 judgment-debtor exam, Brincks provided a short, one-page list of

assets and liabilities he had prepared.   He said the liabilities equaled his creditors.

He had between thirty and forty-five (30-45) creditors listed depending on how they

were counted.   He provided no documentation or back-up for the list.   He says the

list was generated from memory, a number of bank statements, and stuff a

bookkeeper had helped him prepare before she left in 2008.   Brincks additionally

claimed that he had no ledgers or other files to provide.   This list of

liabilities/creditors from 2009 is what he relies heavily upon to show that he had

more than twelve (12) creditors at the time of the involuntary filing in 2011.

Brincks' list included a debt to Agri-Associates of $16,131,368.34 (the amount of

the state court judgment).   However, Brincks also listed as an asset a claim that he

had against Agri-Associates for $19,680,748.23.   He provided no support for that

claim, but stated that he believed it was what Reever owed him for the business

dealings.   In addition, much of what Reever's counsel requested from Brincks

before the exam was never produced.   Brincks did, however, list three bank

accounts he claimed to have at that time.

In August 2010, Reever's counsel conducted a second judgment-debtor exam of Brincks.   Exhibit B lists the materials Brincks provided in response to Reever's new requests.   The responses were similarly incomplete and took a similar tone. Brincks' written responses included various notable statements.   When asked to describe the accounts he was holding, he referred to, among other things, a "bag of money" that he had without specifying anything further about its contents.   When asked about his income and receipts, he said, among other things, that he received money from collecting "pop cans" and other like sources.   He provided a second list of assets and liabilities like the one he provided in 2009, and which he also relies heavily upon.

Brincks provided no tax returns, but said he would get them.   Brincks continued to insist he had no ledgers or any similar bookkeeping.   He now listed six different bank accounts.   This judgment-debtor exam, unfortunately, was not transcribed.   Reever and his counsel testified as to its contents.   They both again described an evasive and defiant Brincks.   He was described as making a "mockery" of the process.   Brincks offered little resistance in his trial testimony to the conduct Reever and his counsel described.   Reever's counsel tried to hold a show cause hearing for Brincks' failure to produce the materials and evade the answers, but Brincks dodged personal service.

13

In late 2010 and early 2011, Reever began hearing rumors that Brincks had received large tax returns—in the neighborhood of $1,000,000—and that Brincks was paying some creditors but not others.    Reever's counsel then held a third judgment-debtor exam on behalf of Reever/Agri-Associates in February 2011. Both Tom Brincks and Beth Van Deist Brincks were subpoenaed.    Beth Van Deist Brincks was excused from attending after providing substantial information in an affidavit.    Tom Brincks and Beth Van Deist Brincks are now divorced.

The documents Brincks provided for the third judgment-debtor exam were introduced in Exhibit C at the trial.    Again, Brincks provided these documents on dark colored paper with small print and/or copied on both sides.    He again brought in a magnifying glass and took the same contemptuous approach to Reever, his counsel, and the process.

Further, the contents of the documents produced were incomplete.    He brought some tax information with him.    He brought some statements from seven of his (now) nine bank accounts.    He listed eight accounts in written response, but later revealed a ninth account—a savings account into which he deposited much of his money.    He said some of the bigger deposits in these various accounts were from taxes.    While he provided bank statements, he provided no checks.    The bank statements did not show what creditors were paid from the checks.    Nevertheless,

14

when asked about which creditors he paid, he made comments like: "There's the bank statement . . . you figure it out." He made similar statements throughout. Again, many things were left incomplete, including the information on taxes.

This third judgment-debtor exam was transcribed by a court reporter. The transcript has been admitted into evidence at trial as Exhibit 3. Brincks continued his combative and evasive approach. He claimed he was "homeless" and when asked where he was residing—he said: "Right now here in the courtroom." He said he slept in his car or at his mom's house. He did admit to receiving somewhere in the neighborhood of $1.1 to $1.2 million dollars in tax returns, but provided little assistance in determining its whereabouts. When specifically asked where the tax money was now or where it had gone, Brincks simply said, "here, there, and everywhere." Brincks continued to be very evasive when asked about when and who he paid and how much.

Many of Brincks' responses about creditors and who he paid contained a similar mantra. He said, for several of the creditors, he could not answer who or how much he paid because he had "confidentiality agreements" with some of the creditors he paid. He never produced the "confidentiality agreements" at the judgment-debtor exams or trial in this case. He declined when requested by Reever/Agri-Associates to enter into a protective order allowing Reever's counsel to

access the agreements and not disclose them or their contents.   When specifically asked which creditors he paid, he said "the list is rather long" and encouraged Reever's counsel "to get into that at a later time with some of the other questions."

Reever's counsel did just that and later asked Brincks about specific creditors that he had and whether they had been paid.   Brincks provided more vague and evasive answers.   He provided no updated list of creditors and continued to rest on the list he provided in August 2009.   When asked about changes to the list, he said things like:   "Not much change."   He did, however, admit paying creditors $800,000 or so from the tax money.   He explained at trial that he believed payment of $800,000 out of the $22,000,000 that he owed (including the huge claim by Reever) did not amount to a significant change.

Yet, such an explanation seems to unravel under close review.   On the one hand, Brincks asserted a debt of more than $22,000,000—and that an $800,000 reduction is not much of a change.   On the other hand, Brincks asserted that he believed Reever actually owed him more than he owed Reever.   In other words, Brincks was asserting that he did not actually owe Reever any of the money from the judgment—which is more than $17,000,000 of the $22,000,000 total.   This shows how Brincks attempts to have it both ways—depending on the circumstances. When beneficial to him, he argues Reever owes him significant money.   Yet, when

16

it helps him evade or explain away responses, he includes the amount he owes Reever.

Brincks did eventually admit he probably reduced the number of creditors by making payments with the tax money.   He provided no further information about whom or how many creditors he paid.   When asked about specific transactions from the few documents he provided, his answers were largely that he did not know or could not tell which creditors actually received payment.

For example, when asked about a December 14, 2010, transfer of $24,800, he stated only that it went to a creditor, or "combination of two or three."   He could not identify which combination of creditors it could have been.   When asked about a $20,000 wire transfer on December 15, 2010, Brincks could only state that it went to another creditor or account, but did not know which.   When asked about a December 22, 2010 $50,000 wire transfer, Brincks claimed to not know where it went and guessed it could be "to creditors" or back into other bank accounts. Brincks said he took "cashier's checks out in different denominations" and "used them to pay creditors."   Brincks maintained, however, that he could not say which creditors got paid.

When asked about specifically named creditors, Brincks responded with either a reference to a "confidentiality agreement" or that he did not know without

17

looking at the lists (which he provided in August 2009 and 2010).    When shown the

lists, he eventually admitted at least twenty (20) creditors were paid or settled up.

When asked more about whether specific creditors were paid from specific

transactions, he admitted to making creditor payments in those transactions, but

again said he was unable to identify which creditor or creditors got paid.

Reever's attorney testified that he could have been there all day and would not

have gotten any more information.    Reever's attorney further testified that he

believed Brincks had paid many, if not a majority, of his creditors from the August

2009 list.    Reever's attorney did not believe Brincks had more than twelve (12)

creditors.

Brincks testified at trial that his testimony and information from the

judgment-debtor exams—properly decoded with his assistance—showed he had

more than twelve (12) creditors on March 1, 2011.    Brincks explained that he and

his attorney came up with fifteen (15) "untainted" creditors he would have had on

March 1, 2011.    Brincks testified at length on this subject.    Much of his testimony

was given without any "back-up" documentation or information.    When Brincks

claimed that there was "back-up" documentation or information for certain

creditors, he claimed the documentation was in files at his office that he did not bring

with him.    These supporting documents were never produced to

18

Reever/Agri-Associates.   He admitted that much of his testimony was based on his memory and "his word."

Many of the "untainted" creditors Brincks asserted—based on "his word"—were those he identified as "prepay" creditors.   "Prepay" refers to creditors that provided prepayment for agricultural chemicals or product—many of which made prepay to Brincks and never received product.   In Brincks' trial testimony, he claims—for the first time—that his "prepays" had separate files.   Brincks never produced the files during discovery and did not bring them to the trial.   Brincks also said the prepays were determined from bank statements and amounts in his head.   Brincks admitted he could have paid off all "prepays" with the tax return money but claims—without any proof—that he did not do so.

The Court finds Brincks' testimony on the issue of existing creditors on the date of the involuntary filing lacks credibility.   Even if the Court were to give his testimony credence, the Court is far from convinced that there were actually twelve (12) or more individual, non-contingent creditors.   Brincks struggled to provide any cohesive explanation of who the twelve (12) or more creditors were on March 1, 2011, and/or how much they were owed.

Many of Brincks' new explanations at trial relied on facts that contradict prior statements.   For example, Brincks asserted that back up for many of his assertions

19

could be found in files he had at home—files never previously produced or even

disclosed.    None of those materials were submitted by him as exhibits at trial.

Further cross-examination of Brincks revealed many additional holes in, or lack of

credibility of, his assertions.

Brincks also claims to have acquired more "new" creditors between the time

of the last judgment-debtor exam and the involuntary filing.    The Court finds this

testimony lacks credibility.    It was offered with little or no support.    It asks the

Court to believe that in less than one month's time he acquired numerous creditors

when he had just testified in a judgment-debtor exam there had been almost no

change in numbers for nearly two years.

After the Petition was filed in this action, additional creditors joined the

involuntary petition.    Bill Wollesen joined as a petitioning creditor on March 29,

2011.    New Cooperative joined as a petitioning creditor on April 5, 2011.    Thomas

Trecker joined as a petitioning creditor on June 9, 2011.    Trecker Brothers also

joined as a petitioning creditor on June 9, 2011.    Brincks has not specifically

contested the legitimacy of these creditors' claims, or their factual qualification to be

filing creditors.    He objected to their joinder only on the basis that the "bad faith"

filing by Agri-Associates (Reever) could not be cured by later joinder.

## CONCLUSIONS OF LAW AND DISCUSSION

20

Brincks argues this Involuntary Petition was improperly filed, and filed in bad faith.   As such, he argues any deficiency in the original filing cannot be cured by later joined creditors.   He claims he is entitled to actual and punitive damages for the improper, bad-faith filing.

Agri-Associates argues it properly filed the Involuntary Petition as a single petitioning creditor.   It also argues any defect in the original, single-creditor filing was cured by the joinder of four additional creditors that are undisputedly qualified. Agri-Associates asserts there is no basis to find a bad-faith filing, even if the original single-creditor filing was deficient.

The case thus raises three key sets of issues: (1) whether the original filing was sufficient under § 303(g) and (h); (2) if insufficient, whether the deficient filing could be cured by adding additional creditors; and (3) if unable to be cured, whether Brincks is entitled to actual or punitive damages.   Because the first two sets of issues are dispositive, the Court will not address the third.

**1.   Sufficiency of Original Involuntary Filing**

The first issue in this case involves the filing requirements for an involuntary petition in bankruptcy.   "The goal or purpose of an involuntary filing should be the equal distribution of assets among creditors."   In re Tichy Elec. Co., 332 B.R. 364,

372 (Bankr. N.D. Iowa 2005) (citing In re Smith, 243 B.R. 169, 174 (Bankr. N.D.

Ga. 1999)).

Section 303 of the Bankruptcy Code governs the commencement of

involuntary cases.   Agri-Associates filed the Involuntary Petition against Brincks

under § 303(b).   That section states, in pertinent part:

> An involuntary case against a person is commenced by the filing with
> the bankruptcy court of a petition under chapter 7 or 11 of this title--
>
> (1) by three or more entities, each of which is either a holder of a claim
> against such person that is not contingent as to liability or the subject of
> a bona fide dispute as to liability or amount, or an indenture trustee
> representing such a holder, if such noncontingent, undisputed claims
> aggregate at least $14,425 more than the value of any lien on property
> of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or
> insider of such person and any transferee of a transfer that is voidable
> under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or
> more of such holders that hold in the aggregate at least $14,425 of such
> claims;

Id. (emphasis added).   Unlike a voluntary bankruptcy, the Order for Relief does not

automatically enter unless the alleged debtor does not contest the filing.   If the

alleged debtor timely contests the filing, the court can enter the Order for Relief only

after finding "the debtor is generally not paying such debtor's debts as such debts

become due unless such debts are the subject of a bona fide dispute as to liability or

amount."   11 U.S.C. § 303(h)(1).

22

The first set of issues in this case specifically deal with the propriety of

Agri-Associates filing this case as a single petitioning creditor.   Brincks has

contested that filing.   Courts have read § 363(b)(2) and (h)(1) together to establish a

four-part test for a contested involuntary petition commenced by a sole petitioning

claimholder.   In re Euro-American Lodging Corp., 357 B.R. 700, 714 (Bankr.

S.D.N.Y. 2007) (citing In re Amanat, 321 B.R. 30, 35 (Bankr. S.D.N.Y. 2005)).   To

satisfy the test, the single petitioning creditor must show:

> (i) the petitioning claimholder's claim is not contingent as to liability or
> subject to a bona fide dispute as to liability or amount, (ii) the
> petitioning claimholder is undersecured by at least [$14,425], (iii) there
> are fewer than twelve claimholders (not counting insiders, employees,
> transferees of voidable transfers, and holders of contingent or disputed
> claims), and (iv) the alleged debtor is generally not paying its debts as
> they come due.

Id.   Brincks concedes Agri-Associates is undersecured by more than $14,425 and

that he was generally not paying his debts as they came due.   Thus, there is no

dispute Brincks has satisfied part (ii) and part (iv) of the test.

The parties here disagree about parts (i) and (iii) of the test.   Specifically,

Brincks disputes whether Agri-Associates' claim against Brincks was the subject of

a bona fide dispute (part (i)), and whether Brincks had fewer than twelve (12)

"qualifying creditors" (part (iii)).   Brincks asserts that Agri-Associates' claim is the

subject of a bona fide dispute as to the amount.   Brincks also asserts he had, and

23

has, more than twelve (12) creditors and accordingly, Agri-Associates' filing as a

single creditor is improper.    In sum, Brincks argues Agri-Associates was ineligible

to commence an involuntary case against him because there was (a) a bona fide

dispute about Agri-Associates' claim and (b) he had twelve (12) or more creditors at

the time of filing.    The Court will address these two issues separately.

### a. Agri-Associates' Claim Is Not the Subject of a Bona Fide Dispute

Section 303(b) specifically provides that a petitioning creditor must be the

holder of a claim that is not the subject of a bona fide dispute.    As a leading treatise

notes:

> Limiting qualifying claims to those not subject to bona fide dispute was
> an attempt to balance the interests of debtors and creditors in
> involuntary cases.    If creditors with clearly disputed claims could
> initiate an involuntary filing, creditors could improperly use the
> involuntary process (or threat of it) to extort either payment or at least a
> favorable resolution of a bona fide dispute from a debtor.

2 Collier on Bankruptcy ¶ 303.11 (Alan N. Resnick & Henry J. Sommer eds., 16th

ed. 2011) (footnotes omitted).

"The burden of proof lies with the petitioning creditor[ ] to establish that [its

claim is] not subject to a bona fide dispute and that the debtor is not paying debts as

they become due."    Tichy Electric, 332 B.R. at 371 (citing In re ELRS Loss

Mitigation, LLC, 325 B.R. 604, 609–10 (Bankr. N.D. Okla. 2005)).    The

Bankruptcy Code does not define "bona fide dispute."    The Eighth Circuit has

adopted an objective inquiry to determine if there exists a bona fide dispute on a

claim.    Rimell v. Mark Twain Bank (In re Rimell), 946 F.2d 1363, 1365 (8th Cir.

1991), cert. denied, 504 U.S. 941 (1992).    This Court has applied that definition.

In re H & H Distrib. Co. of Clear Lake, No. 95-40614XM at 2 (Bankr. N.D. Iowa

Oct. 6, 1995).    "[A] bona fide dispute exists if there are substantial factual and legal

questions raised by the debtor" as to its liability.    Rimell, 946 F.2d at 1365

(citations omitted).    "The debtor's subjective belief as to the genuineness of the

dispute does not satisfy the test."    H & H Distrib., at 2.

Brincks argues its debt with Agri-Associates is the subject of a bona fide

dispute.    The parties agree that before Agri-Associates filed the Petition it had a

state court judgment against Brincks.    On May 12, 2009, the Iowa District Court

granted Agri-Associates' Motion for Summary Judgment and entered a judgment

against Brincks for $16,131,368.34, plus accruing interest.    Brincks did not appeal

or otherwise succeed in having the judgment set aside.    It is a final, binding

judgment under Iowa law.    Agri-Associates offers this state court judgment as

proof of the debt.    It asserts this judgment is dispositive of the issue, as it must be

given preclusive effect under the Rooker-Feldman doctrine and/or preclusion

principles.

Brincks disagrees, and argues that Agri-Associates cannot rely on the state court judgment.   Brincks asserts the Rooker-Feldman doctrine does not apply.   He also argues any such doctrine cannot be used offensively (i.e. by the party with the burden of proof who is bringing the claim).   Brincks argues the state court judgment has no preclusive effect, and Agri-Associates is unable to show its claim is not the subject of a bona fide dispute.

The Court agrees with Brincks that the Rooker-Feldman doctrine does not apply in this case, however, disagrees as to his remaining assertions.   The Rooker-Feldman doctrine got its name from two cases that formed the rule — Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).   "The doctrine has the same effect as the preclusion doctrines of res judicata and collateral estoppel, and is concerned with the finality of state court judgments."   Bakonyi v. Boardroom Info. Sys. (In re Quality Laser Works), 211 B.R. 936, 942 (B.A.P. 9th Cir. 1997).   Under Rooker-Feldman, "'a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights' . . . ."   Knutson v. City of Fargo, 600 F.3d 992, 995 (8th Cir. 2010) (quoting Johnson v. De Grandy, 512 U.S. 997, 1005-06 (1994)).   The Eighth Circuit went on to note

26

that cases decided since 1983 reminded the court "of the narrow application of the rule, 'confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" Id. (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)).   After noting the limitations on the doctrine by more recent Supreme Court cases, the Eighth Circuit reiterated that in spite of the similarities "Rooker-Feldman is not simply preclusion by another name."   Id. at 995 (citation omitted).

Both the Eighth Circuit and the Eighth Circuit B.A.P. have been careful to limit the Rooker-Feldman doctrine to this "narrow application."   Id.; Jacobus v. Binns (In re Binns), 328 B.R. 126 (B.A.P. 8th Cir. 2005).   Of particular relevance to this case, the B.A.P. noted in Binns that the Rooker-Feldman doctrine simply does not apply unless "state court losers" are "trying to obtain a review and a rejection of [a state court judgment]."   Binns, 328 B.R. at 131-32.   The court made it explicitly clear in cases—like the one before this Court—where the "state court winner (the Plaintiff) is trying to offensively use the [state-court judgment] to establish the basis" for its claim the doctrine does not apply.   Binns, 328 B.R. at 132.   The B.A.P., like the Eighth Circuit in Knutson, went to some length to point out that "Rooker-Feldman does not otherwise override or supplant preclusion doctrine or

27

augment the circumscribed doctrines that allow federal courts to stay or dismiss

proceedings in deference to state-court actions." Binns, 328 B.R. at 131 (quoting

Exxon Mobil, 544 U.S. at 284). The court in Binns then referred back to its earlier

discussion of collateral estoppel where it observed that the bankruptcy court

"correctly held that the preclusive effect of a state court judgment in a subsequent

federal case is determined by reference to state law." Id. at 129 (citations omitted).

The Eighth Circuit has discussed the proper use of preclusion doctrines and

noted—as noted in Binns—that ultimately a determination is made with reference to

state law. The Eighth Circuit has framed the discussion by noting "the preclusive

effect of a prior state court judgment is determined by the Constitution's Full Faith

and Credit Laws, Article IV, § 1, as implemented by the federal Full Faith and Credit

Statute, 28 U.S.C. § 1738." Rick v. Wyeth, Inc., 662 F.3d 1067, 1069 (8th Cir.

2011). "[T]he Supreme Court has explained, 'that a federal court must give to a

state-court judgment the same preclusive effect as would be given that judgment

under the law of the State in which the judgment was rendered.'" Id. (quoting

Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984)); see also

Knutson, 600 F.3d at 996. "Full faith and credit comprises the law of issue and

claim preclusion and 'is not a jurisdictional matter.'" Knutson, 600 F.3d at 996

(quoting Exxon Mobil, 544 U.S. at 293)). "According to the terms of the

28

full-faith-and-credit-statute, we apply state preclusion law in our analysis." <u>Id.</u>

<u>See</u> <u>also</u> <u>In re Moretto</u>, 440 B.R. 534, 538 (B.A.P. 8th Cir. 2010) ("Under 28 U.S.C.

§ 1738, a state court judgment is entitled to the same preclusive effect in federal

court as it is in the courts of the rendering state.").

Under Iowa law, "[t]he doctrine of res judicata includes both claim preclusion

and issue preclusion."   <u>Pavone v. Kirke</u>, No. 09-0222, 2011 WL 6129356, at *6

(Iowa Dec. 9, 2011) (citation omitted).   "The general rule of claim preclusion holds

that a valid and final judgment on a claim bars a second action on the adjudicated

claim or any part thereof."   <u>Id.</u> (citing <u>Arnevik v. Univ. of Minn. Bd. of Regents</u>,

642 N.W.2d 315, 319 (Iowa 2002)).   "Therefore, a party must litigate all matters

growing out of the claim, and claim preclusion will apply not only to matters

actually determined in an earlier action but to all relevant matters that could have

been determined."   <u>Id.</u> (quoting <u>Penn v. Iowa State Bd. of Regents</u>, 577 N.W.2d

393, 398 (Iowa 1998)).   "Claim preclusion may preclude litigation on matters the

parties never litigated in the first claim."   <u>Id.</u>   The rationale for the doctrine is as

follows:

> The policy of the law underlying claim preclusion is that a claim cannot
> be split or tried piecemeal.   Thus, a party must try all issues growing
> out of the claim at one time and not in separate actions.   An
> adjudication of a prior action between the same parties on the same
> claim is **final as to all issues that could have been presented to the**

> **court for determination**.   Simply put, the party is not entitled to a
> "second bite" simply by alleging a new theory of recovery . . . .

Id. at *7 (quoting Bennett, 586 N.W.2d at 516-17) (emphasis added).   The Iowa

Supreme Court made clear "[a] second claim is likely to be barred by claim

preclusion where the acts complained of, and the recovery demanded are the same or

**where the same evidence will support both actions**."   Id. (quoting Arnevik, 642

N.W.2d at 319) (other quoted citations omitted) (emphasis added).

> To establish claim preclusion a party must show: (1) the parties in the
> first and second action are the same parties or parties in privity, (2)
> there was a final judgment on the merits in the first action, and (3) the
> claim in the second suit could have been fully and fairly adjudicated in
> the prior case (i.e., both suits involve the same cause of action). 'The
> absence of any one of these elements is fatal to a defense of claim
> preclusion.'

Id.   "A valid final judgment on a claim generally precludes relitigation of the same

claim or any part of it."   Lambert v. Iowa Dep't of Transp., 804 N.W.2d 253, 257

(Iowa 2011) (citing Arnevik, 642 N.W.2d at 257).

Under Iowa Rule of Civil Procedure 1.951, "every final adjudication of any of

the rights of the parties in action is a judgment."   Peppmeier v. Murphy, 708

N.W.2d 57, 64 (Iowa 2005) (quoting Rule 1.951).   "[A] judgment is a 'final

judgment' if it 'finally adjudicates the rights of the parties.'"   Id. (quoting Nuzum v.

State, 300 N.W.2d 131, 133 (Iowa 1981)).   Under Iowa law, "a **summary**

**judgment** dispositive of the entire case **is a final adjudication** from which appeal

may be taken." Nuzum, 300 N.W.2d at 133 (quoting Mid-Continent Refrigerator

Co. v. Harris, 248 N.W.2d 145, 146 (Iowa 1976)) (emphasis added). The Iowa

Supreme Court has noted in discussing preclusion and final judgment that "it is clear

that an **entire claim may be precluded by a judgment that does not rest on any**

**examination whatever of the substantive rights asserted**." Peppmeier, 708

N.W.2d at 65 (quoting 18A Charles Alan Wright, Arthur R. Miller & Edward H.

Cooper, Federal Practice and Procedure § 4435 (2d ed. 2002)) (emphasis added).

Of particular relevance here, the Iowa Supreme Court noted:

> Both claim preclusion and issue preclusion result from summary
> judgments that rest on the lack of any genuine issue of material fact
> going to the merits of claim or defense. To be sure, it might be
> possible to advance the sophistic argument that preclusion is
> inappropriate since there has been no resolution of questions of fact,
> only a determination that there are no questions of fact. . . . **Preclusion**
> **is appropriate even if the summary-judgment motion went**
> **unopposed**; the court still must decide that the moving party has
> carried the summary-judgment burden, and a party should not be able
> to salvage a losing position for another day by simply walking away
> from the summary-judgment proceeding.

Id. at 65 (quoting 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,

Federal Practice and Procedure § 4435 (2d ed. 2002)) (emphasis added).

While the Court concludes that claim preclusion is appropriate here, the same

conclusion is appropriate under issue preclusion standards. See Soults Farms, Inc.

31

v. Schafer, 797 N.W.2d 92, 103-04 (Iowa 2011) (setting out rationale and test for use

of collateral estoppel and noting collateral estoppel may be used offensively).   To

the extent the above text leaves any doubt about the application of collateral estoppel

to summary judgment, the Peppmeier court left no doubt when it stated

that "[i]t would be strange indeed if a summary judgment could not have collateral

estoppel effect.   This would reduce the utility of this modern device to zero . . . .

Indeed, a more positive adjudication is hard to imagine." Peppmeier, 708 N.W.2d at

65–66 (quoting Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 421 F.2d

1313, 1319 (5th Cir. 1970)).

By offering the summary judgment as proof that its liquidated claim is

undisputed, Agri-Associates provided sufficient evidentiary proof that its' claim is

not the subject of a bona fide dispute under § 303(b).   Brincks cannot show

"substantial factual and legal questions" as to his liability to Agri-Associates.

Rimell, 946 F.2d at 1365.   Further, given the finality of Agri-Associates' judgment,

the Court is not concerned that Agri-Associates is improperly attempting to "use the

involuntary process (or threat of it) to extort either payment or at least unfavorable

resolution of a bona fide dispute from a debtor."   2 Collier on Bankruptcy ¶ 303.11.

Brincks is left only with his own "subjective belief" that the debt is in

dispute—which is not enough.   H & H Distrib. at 2.   As such, Agri-Associates'

32

liquidated claim, evidenced by the state court summary judgment, is not the subject

of a bona fide dispute.   This Court's conclusion on this issue is in accord with a

decision from the Ninth Circuit B.A.P. addressing this issue in an involuntary case.

Marciano v. Fahs (In re Marciano), 459 B.R. 27, 53-56 (9th Cir. B.A.P. 2011).

### b.  Agri-Associates Proved That Brincks Has Fewer Than Twelve Holders of Claims Under § 303

Agri-Associates filed the involuntary petition as a single creditor under 11

U.S.C. § 303(b)(2).   Thus, in addition to proving that its claim is not the subject of a

bona fide dispute, Agri-Associates must prove Brincks, at the time of filing, had

fewer than twelve (12) creditors "excluding any employee or insider of such person

and any transferee of a transfer that is voidable under section 544, 545, 547, 548,

549, or 724(a) of this title . . . ."   11 U.S.C. § 303(b)(2).   See, e.g., Atlas Mach. &

Iron Works, Inc. v. Bethlehem Steel Corp., 986 F.2d 709, 715–16 (4th Cir. 1993)

(burden of proof on sole petitioning creditor to show alleged debtor has fewer than

twelve (12) creditors); Euro-American Lodging, 357 B.R. at 714 (same).

The Court finds and concludes that Agri-Associates and Reever have carried

the burden of showing that Brincks had fewer than twelve (12) creditors at the time

of filing.   Agri-Associates' attorney, for two of the three judgment-debtor exams,

testified that after all the inquiries he made on behalf of Agri-Associates and Reever,

he concluded there were fewer than twelve (12) creditors.   His conclusion is based

33

in large part on his study of the issues in conjunction with his conclusion that
Brincks was simply not telling the truth about who he paid and how much he paid.
There was substantial argument in the post-trial briefing about how Agri-Associates
and Reever reached their number of less than twelve (12)—as well as arguments
about Brincks' claim of at least fifteen (15) "untainted" creditors.    After excluding
employees, insiders (family members), and those receiving preferential and/or
fraudulent transfers, Brincks claimed that Agri-Associates' best case was that
Brincks had eleven (11) creditors at the time of the Agri-Associates filing.    Brincks
points out that Agri-Associates failed to include itself as a creditor and a tax
obligation on a parcel of land.    Brincks believes there were, even under
Agri-Associates' count, more than twelve (12) creditors.    (<u>See</u> Attachment to
Petitioning Agri-Associates' Post-Trial Brief (showing eleven (11) creditors, at best,
for Brincks)).

　　　The Court disagrees with Brincks.    The spreadsheets, that make up the
attachment to Agri-Associates' Post-Trial Brief, do show eleven (11) "shaded" or
outstanding creditors.    Agri-Associates argues these are the creditors that could
count on the date of the involuntary filing—after "giving Debtor the alleged benefit
of the doubt despite his failure to provide evidence as to their existence."
(Agri-Associates' Post-Trial Brief, at 10 n.12.)    As the Court noted in its findings of

34

fact, a number of the creditors that Brincks relies upon, and that Agri-Associates "shaded", to give Brincks the benefit of the doubt, are based on Brincks' testimony of "pre pay" creditors.   In fact, six (6) of the eleven (11) shaded creditors fall in the category of "pre pay" creditors for which Brincks had no supporting documentation. As the Court noted, the existence of those creditors is based on Brincks' word alone. The Court has noted that it did not believe Brincks' testimony to be credible on those issues.   Thus, the Court did not include any of those six (6) "pre pay" creditors in its tabulation of likely creditors on the day of the involuntary filing.

Similarly, Brincks has argued that he accumulated additional creditors not known or disclosed to Agri-Associates following the last judgment-debtor exam. Brincks, again, offered no testimony or proof.   He simply offered his bare statements.   The Court does not find Brincks' testimony to be credible as noted in the fact-findings.

In sum, the Court finds Agri-Associates/Reever carried the burden of showing there were more likely than not fewer than twelve (12) creditors on the date of filing. The Court also finds that Brincks failed to rebut Agri-Associates' proof of fewer than twelve (12) qualifying creditors.   Because Brincks had fewer than twelve (12) qualifying creditors as of the Involuntary Petition date, the Court finds no defect in the filing of the Involuntary Petition.

35

Brincks has argued that Agri-Associates should not even be allowed to contest this issue because it made a critical admission in response to Brincks' request for admissions.   He claims Agri-Associates' failure to respond within thirty (30) days to the requests (it responded in forty-two (42) days) resulted in the question being deemed admitted.   The question asked Agri-Associates to admit there were twelve (12) or more creditors on the date of filing.   Brincks has asked the Court to find that that admission is binding and dispositive of the issue.

Agri-Associates has asked the Court not to apply the rules as Brincks requests.   Agri-Associates points out the admission should not even be viewed as untimely because the Court continued the trial and extended all discovery while the Request for Admission was pending.   It essentially argues the time to respond should be viewed as continued with the discovery deadline order.   It also argues that even if late, the rule deeming it admitted allows for the admission to be set aside. It claims the admission meets the test because it deals with a critical issue and the opposing party (Brincks) would not be prejudiced.   It points out the admission answer was only ten (10) days late and made more than forty (40) days before trial—plenty of time for Brincks to prepare.   It alleges that Brincks knew that this issue was not admitted, did not rely on the admissions lateness, and had plenty of time to prepare on the substantive issue (twelve (12) or more creditors).

36

The Court finds that Agri-Associates has provided sufficient reason and rationale for not deeming the matter admitted—or setting the admission aside.   The Court's order continuing trial and extending discovery deadlines continued the deadline for which the Requests for Admission were due, and accordingly, the Request for Admissions was timely answered.

Further, even if the discovery deadlines had not been extended, the Court finds that under Federal Rule of Civil Procedure 36, the admission was withdrawn.

> Rule 36(b) states in pertinent part: '[T]he court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits.'

Gutting v. Falstaff Brewing Corp., 710 F.2d 1309, 1313 (8th Cir. 1983).   "If a litigant is allowed to file a late reply, he in effect is being permitted to withdraw an admission.   Consequently late filing should not be permitted if it would prejudice the requesting party."   Pleasant Hill Bank v. United States, 60 F.R.D. 1, 3 (W.D. Mo. 1973).   However, "[p]ermitting the amendment of responses to a request for admissions is in the interests of justice if the record demonstrates that the 'admitted' facts are contrary to the actual facts."   F.D.I.C. v. Prusia, 18 F.3d 637, 641 (8th Cir. 1994).

> Rule 36 allows a party to withdraw or amend an admission when the presentation of the merits of the action will be subserved thereby and

37

the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice [him].' Fed. R. Civ. P. 36(b); see also Beatty v. United States, 983 F.2d 908, 909 (8th Cir. 1993) (allowing a late amendment and noting that the plaintiff was not prejudiced by the amended admission; rather 'he [was] prejudiced by the true facts contained in the [late] response').

Bender v. Xcel Energy, Inc., 507 F.3d 1161, 1168 (8th Cir. 2007).

Here, like the Plaintiff in Beatty, Brincks is not prejudiced by the amended admission, but is instead prejudiced by the fact that the record shows he had fewer than twelve (12) qualifying creditors as of the Involuntary Petition date, as already discussed.  See Beatty, 983 F.2d at 909.  Agri-Associates (Reever) has satisfied the Rule 36(b) standard in that the merits of the action would be subserved were the admission relied upon, and further, Brincks has failed to offer evidence of prejudice. Moreover, Brincks' argument that he relied upon the admission, and thus as a trial strategy did not present evidence to support this fact, is unpersuasive.  Brincks presented a plethora of evidence in an attempt to prove the number of qualified creditors he had.  The Court finds that the admission did not affect Brincks' trial strategy.

Brincks' final argument as to this point is that Agri-Associates failed to request relief from the fact deemed admitted.  The Court interprets the written and oral arguments by Agri-Associates' counsel as an oral motion to waive the Rule 36 admissions.  See Quasius v. Schwan Food Co., 596 F.3d 947, 952 (8th Cir. 2010)

38

(the court has the "authority to permit withdrawal or amendment of admissions under Rule 36(b), because the party who admitted matters later filed with the court a pleading that was sufficient to constitute a 'motion' under a liberal reading of the rule"); Rodgers v. Allen, No. 05c3540, 2009 WL 2872912, at *3 (N.D. Ill. 2009). As the Court finds that the deadline was extended by order, and thus, the answer was timely filed, the motion is moot.

Accordingly, the Court finds the evidence is ultimately outweighed by the overwhelming record of evidence recited above that indicates the very strong likelihood (because the truth will never be known given Brincks' inadequate testimony and documentation) that Brincks had less than twelve (12) creditors on the date of filing.

## 2.   Joinder By Four Other Qualifying Creditors

The Court's findings that Brincks had less than twelve (12) creditors at the time of filing, and that there is no bona fide dispute about Agri-Associates' debt, are dispositive.   Even if the Court's finding of less than twelve (12) creditors is incorrect, however, it does not help Brincks here.   Agri-Associates was able to get four other creditors to join the involuntary petition before the trial.   The Court finds this cured any problems with the filing and made it valid even if Brincks ultimately did have twelve (12) or more creditors.

39

Section 303(c) specifically provides for other qualifying creditors to join the

Petition after it was filed.   Subsection (c) states:

> [a]fter the filing of a petition under this section but before the case is
> dismissed or relief is ordered, a creditor holding an unsecured claim
> that is not contingent, other than a creditor filing under subsection (b)
> of this section, may join in the petition with the same effect as if such
> joining creditor were a petitioning creditor under subsection (b) of this
> section.

11 U.S.C. § 303(c) (emphasis added).   Rule 1003(b) governs the procedure by

which other qualifying creditors may join an involuntary petition after filing.   That

rule states:

> If the answer to an involuntary petition filed by fewer than three
> creditors avers the existence of 12 or more creditors, the debtor shall
> file with the answer a list of all creditors with their addresses, a brief
> statement of the nature of their claims, and the amounts thereof.   If it
> appears that there are 12 or more creditors as provided in § 303(b) of
> the Code, the court shall afford a reasonable opportunity for other
> creditors to join in the petition before a hearing is held thereon.

Fed. R. Bankr. P. 1003(b).

"[T]he bankruptcy laws adopt a 'charitable attitude toward petitions

mistakenly asserting that there are less than twelve creditors. . . .'"   Basin Elec.

Power Coop v. Midwest Processing Co., 769 F.2d 483, 486 (8th Cir. 1985) (citing In

re Crown Sportswear, Inc., 575 F.2d 991, 993 (1st Cir. 1978)).   "Other creditors,

who have not filed under 11 U.S.C. § 303(b) may join the petition with the same

effect as if it had been a petitioning creditor, as long as the petition was filed in good

40

faith." In re Bock Transp., Inc., 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005) (citing 11

U.S.C. § 303(c); Basin Elec. Power Coop, 769 F.2d at 486 (8th Cir. 1985)).

Brincks made two challenges to Agri-Associates' offer of the joining

creditors.   First, he contends that as a result of the joining creditors' failure to

appear at the hearing, their joinders cannot be considered under a failure to prosecute

argument.   Second, Brincks argues the original petition was filed in bad faith, and

consequently, the joinders do not cure the deficiencies in the original filing by

Agri-Associates under Basin Electric and Bock Transportation.   The Court

concludes neither of these arguments have merit.

### a.   Failure to Prosecute

Brincks argued that the fact the four joining creditors were not in attendance

meant their joinders could not be considered.   He argued that these creditors failed

to prosecute their case—and their joinders should be dismissed.   The Court

disagrees.

The only applicable cases hold that where the merits of the claims of joining

creditors have not been placed in dispute before trial, those joining creditors need

not attend.   LaRoche v. Amoskeag (In re LaRoche), 969 F.2d 1299, 1305 n.12 (1st

Cir. 1992); IBM Credit Corp. v. Compuhouse Sys., Inc., 179 B.R. 474, 478 (W.D.

Pa. 1995).   The Court in LaRoche found that participation of a joining creditor

41

whose claim was not challenged was not required "any more than the holder of a duly filed proof of claim"—who is not required to participate in proceeding "prior to the time it is called upon to defend its claim or otherwise respond."   969 F.2d at 1305.   In <u>IBM Credit</u>, the court found that joining creditors' failure to appear at a motion to dismiss hearing was not fatal, as no challenge had been made by the alleged debtor as to the joining creditors' claims.   179 B.R. at 478.   Here, Brincks did not challenge the merits of the claims of the joining creditors.   There was no need for them to be in attendance.   The citations offered by Brincks are not controlling, or persuasive, to this question.   To the extent those citations offer anything to the analysis of the issue, their authority is substantially outweighed by the above authorities specifically addressing similar factual circumstances.

### b.  Good-Faith Filing

Brincks' second argument is that the other creditors cannot join as a matter of law because Agri-Associates' Petition was not filed in good faith.   The Eighth Circuit and Eighth Circuit B.A.P. have held a good-faith filing of the original petition is a prerequisite to joinder being allowed.

The Eighth Circuit established the rule in <u>Basin Electric</u>, 769 F.2d at 486. The Eighth Circuit B.A.P. discussed it at some length in <u>Bock Transportation</u>.   The B.A.P. began with a foundational observation about good faith.   "The Bankruptcy

42

Code does not explicitly require that a bankruptcy petition be filed in good faith, but

the Eighth Circuit has found that the Code contains an implicit good faith

requirement"  Bock Transp., 327 B.R. at 381.   The B.A.P. then continued:

> Proving an involuntary petition was filed in bad faith requires an inquiry into the creditor's knowledge.   Where fewer than three creditors file the petition and the debtor has twelve or more creditors, the threshold question is whether the creditor **knew** the debtor had twelve or more creditors.   Basin Elec. Power Coop, 769 F.2d 483 at 486.   In Basin Electric, the court stated "While an involuntary petition may be cured after filing when a single creditor files in good faith believing the debtor has fewer than twelve creditors, a single creditor may not file an involuntary petition knowing the debtor has twelve or more creditors."   Id.

> In Basin Electric it was not necessary to determine the level of knowledge required because the filing creditor admitted having actual knowledge that the debtor had twelve or more creditors.   Id. at 485. The same may not be said here.   The bankruptcy court had to decide whether Paul knew Bock Transportation had twelve or more creditors.

Id. at 381 (emphasis added).

Brincks has entirely failed to show Agri-Associates "knew" Brincks had more

than twelve (12) creditors.   As the Court has found, the record shows Brincks had

less than twelve (12) creditors.   Again, even if the Court were to find that Brincks

had properly demonstrated that a careful analysis of his records (with his help—not

hindrance) could have indicated that he actually had more than twelve (12) creditors,

it still does not help Brincks.   He did not show Agri-Associates "**knew**", or even

should have known, he had more than twelve (12) creditors.   Even if the Court were

43

to view the facts in a light most favorable to Brincks, the record shows that the number of creditors Brincks had was confusing.   That confusion was caused by Brincks.   The fact that he attempted to help clarify the issue at trial—though not much—does not establish or even suggest Agri-Associates knew there were more than twelve (12) creditors and filed the involuntary as a single petitioning creditor anyway.

In this case, the Court finds that, even giving Brincks every benefit of the doubt, the exhibits and testimony are far from conclusive as to exactly how many qualifying creditors Brincks had on the date of the Involuntary Petition.   It should be reiterated, however, that while the exact number is not conclusive, the Court has found that Brincks' testimony was not credible and that he had less than twelve (12) qualifying creditors under § 303(b) of the Bankruptcy Code at the time of filing.

But even if that conclusion is ultimately incorrect, the Court finds that Agri-Associates filed the Involuntary Petition in good faith.   In other words, even if Brincks had more than twelve (12) creditors, the Court finds that two or more additional qualifying creditors could "cure"—and did cure—Agri-Associates' deficient filing by joining the Involuntary Petition.   For these reasons, Brincks' objections to the joinder of Bill Wollesen, New Cooperative, Thomas Trecker, and Trecker Brothers, on the basis of bad-faith filing, are overruled.

44

### 3.  Brincks' Claim for Damages

Brincks made claims for damages for bad-faith filing.   These claims need not be addressed.   There was no bad faith (of Agri-Associates) established at trial.

**WHEREFORE,** Alleged Debtor Thomas Brincks' Motion to Dismiss is DENIED;

**FURTHER,** Brincks' Objection to Joinder of Bill Wollesen as a Petitioning Creditor to Involuntary Chapter 7 Petition is OVERRULED;

**FURTHER,** Brincks' Objection to Joinder of New Cooperative as a Petitioning Creditor is OVERRULED;

**FURTHER,** Brincks' Objection to Joinder of Thomas Trecker as a Petitioning Creditor is OVERRULED;

**FURTHER,** Brincks' Objection to Joinder of Trecker Brothers as a Petitioning Creditor is OVERRULED;

**FURTHER,** Brincks' Motion to Dismiss for Failure to Prosecute is DENIED AS MOOT;

**FURTHER,** Agri-Associates' request for withdrawal of admission is DENIED AS MOOT;

**FURTHER,** the Order for Relief will be entered pursuant to § 303(h).

Dated and Entered: January 30, 2012

_____

THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE